UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| SILICON HILLS CAMPUS, LLC, | § | No. 1:20-CV-1201-DAE |
| | § | |
| Appellant–Debtor, | § | |
| | § | |
| vs. | § | |
| | § | |
| TUEBOR REIT SUB, LLC, and | § | |
| ATX DEBT FUND 1, LLC, as | § | |
| successor in interest to TUEBOR | § | |
| REIT SUB, LLC, | § | |

Appellees–Lenders.

ORDER AFFIRMING BANKRUPTCY COURT'S ORDER
GRANTING MOTION FOR RELIEF FROM STAY

Before the Court is an appeal from bankruptcy court arising from the grant of an Amended Motion for Relief from Stay filed by Tuebor Reit Sub, LLC ("Lender" or "Tuebor") on December 8, 2020. (Dkt. # 1.) The Order Granting Lender's Motion for Relief from Stay was issued on November 24, 2020, by United States Bankruptcy Judge Tony M. Davis in the underlying bankruptcy proceeding. (In re Silicon Hills Campus, LLC, Bankr. W.D. Tex., No. 20–10042–TMD, Dkt. # 230; Dkt. # 1 at 7–8.) For the reasons that follow, the Court **AFFIRMS** the grant of Lender's Amended Motion for Relief from Stay.

1

# FACTUAL BACKGROUND

Appellant–Debtor Silicon Hills Campus, LLC ("Appellant–Debtor" or "Appellant" or "Debtor") is the owner of the former 3M campus in Austin, consisting of a 158-acre parcel, 1.2 million square foot building, power plant, and other real estate in northwest Austin (the "Property"). (Dkt. # 5 at 9.) The Property has been rebranded as Silicon Hills Campus, and because it is the only asset owned by Appellant–Debtor, Appellant–Debtor is considered a single-asset estate debtor. (Dkt. # 13 at 10.) Appellee–Lender is ATX Debt Fund 1, LLC, who is the successor in interest to Tuebor REIT Sub, LLC. (Id.) Appellee is the holder and owner of a loan under which Appellant owes Appellee over $64 million. (Id.)

Ladder Capital Finance, LLC ("Original Lender") originally loaned Appellant $64 million on February 6, 2018. (Id. at 10–11.) The loan was meant to be short-term and was secured by the Property. (Id. at 11.) All parties knew that the Property's lease agreement with 3M Company would end in August 2019 and that the 3M lease was the sole source of income to the Property. (Id.) Appellant hoped to either refinance the Property or find a replacement lessee or purchaser before the 3M lease expired. (Id.) On February 8, 2018, the Original Lender assigned its right, title, and interest in the loan to Tuebor ("Lender"), and on December 18, 2020, Lender assigned its right, title, and interest in the loan to ATX Debt Fund 1, LLC ("Appellee–Lender"). (Id.)

2

During the months leading up to the expiration of 3M's lease, Appellant started to request maturity extensions from Lender because it had not yet obtained refinancing, a new lessee, or purchaser for the Property. (Id. at 12.) The Lender and Debtor successfully completed two such maturity extensions, however, Debtor did not complete the necessary steps to receive an extension beyond August 30, 2019 (the "Maturity Date"). (Id.) The Debtor failed to pay the full amount owed to Lender, resulting in the Debtor defaulting on the loan. (Id.) Upon the Debtor's default, the Lender scheduled a nonjudicial foreclosure sale of the Property. (Id.)

## PROCEDURAL BACKGROUND

In response to the upcoming nonjudicial foreclosure sale, Appellant–Debtor filed its Voluntary Petition for Relief under Chapter 11 on January 7, 2020. (Dkt. # 5 at 8.) On November 24, 2020, the Bankruptcy Court for the Western District of Texas considered Appellee's Amended Motion for Relief from the Automatic Stay and lifted the stay to allow Appellee to proceed with its state law remedies against the Property, including foreclosure. (Id.) Before orally ruling on the Motion on the record, the Bankruptcy Court held two days of evidentiary hearings. (Dkt. # 5 at 13.)

Appellant filed its Notice of Appeal on December 7, 2020. (Dkt. # 1.) This is an appeal from the United States Bankruptcy Court's Order lifting the stay.

(Dkt. # 5 at 8.) On February 4, 2021, Appellant received a foreclosure notice from Appellee, setting a foreclosure sale for March 2, 2021. (Dkt. # 6 at 14–27.) Appellant filed a Motion to Stay on February 11, 2021 (Dkt. # 6.) The Court denied Appellant's Motion to Stay on March 1, 2021. (Dkt. # 12.) U.S. District Judge Robert Pitman transferred the case to this Court on September 8, 2021. (Dkt. # 16.)

## LEGAL STANDARD

When reviewing an order of the bankruptcy court, this Court functions as an appellate court, applying the standard of review generally applied in federal courts of appeals. Webb v. Reserve Life Ins. Co., 954 F.2d 1102, 1103–04 (5th Cir. 1992). Bankruptcy Rule 8013 outlines the standard of review for district courts to apply to orders and judgments issued by the bankruptcy court. Rule 8013 states:

> On an appeal, the district court or bankruptcy appellate panel may affirm, modify, or reverse a bankruptcy judge's judgment, order, or decree or demand with instructions for further proceedings. Findings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the bankruptcy court to judge the credibility of the witnesses.

Fed. R. B. P. 8013.

Therefore, the bankruptcy's court factual findings may only be reversed by the reviewing court if they are clearly erroneous. Sequa Corp. v. Christopher, 28 F.3d 512, 514 (5th Cir. 1994). A finding of fact is clearly erroneous when "the

4

reviewing court on the entire evidence is left with a firm and definite conviction that a mistake has been committed." United States v. U.S. Gypsum Co., 333 U.S. 364, 395 (1948). But when a Bankruptcy Court premises a finding of fact upon an improper legal standard, that finding loses the insulation of the clearly erroneous rule. Fabricators, Inc. v. Technical Fabricators, Inc. (In re Fabricators, Inc.), 926 F.2d 1458, 1464 (5th Cir. 1991).

Unlike factual findings, a district court may review a bankruptcy court's legal conclusions *de novo*. Matter of Foster Mortg. Corp., 68 F.3d 914, 917 (5th Cir. 1995). Under the de novo standard, the district court is required "to make a judgment independent of the Bankruptcy Court's without deference to that court's analysis and conclusions." Lawler v. Guild. Hagan & Clark, Ltd. (In re Lawler), 106 B.R. 943, 952 (N.D. Tex. 1989). "Valuation is a mixed question of law and fact, the factual premises being subject to review on a clearly erroneous standard, and the legal conclusion being subject to de novo review." In re T-H New Orleans Ltd. Partnership, 116 F.3d 790, 799 (5th Cir. 1997).

## DISCUSSION

Appellant–Debtor argues that the Bankruptcy Court erred by granting the Lender's Amended Motion for Stay from Relief. (Dkt. # 5 at 19.) It asserts that the Bankruptcy Court erred by basing its ruling on clearly erroneous factual

5

findings that "(1) the Debtor lacked equity in the Property and (2) that Debtor did not have a reasonable prospect of reorganization." (Id.)

Appellee–Lender argues that the Bankruptcy Court correctly found that it was entitled to relief under § 362(d)(2) of the Bankruptcy Code. (Dkt. # 13 at 15.) § 362(d)(2) provides that:

> (d) On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay—
> > (2) with respect to a stay of an act against property under subsection (a) of this section, if—
> > > (A) the debtor does not have an equity in such property; and
> > > (B) such property is not necessary to an effective reorganization.

11 U.S.C. § 362(d)(2). "In every case where a creditor seeks relief under § 362(d)(2), the creditor has the burden to establish the lack of equity in the property and the debtor has the burden to establish that the property is necessary for an effective reorganization." Matter of Canal Place Ltd. P'ship, 921 F.2d 569, 576 (5th Cir. 1991) (citing 11 U.S.C. § 362(g)).

I. Equity in the Property

Appellant contends that the Bankruptcy Court committed clear error in its valuation finding that Appellant had no equity in the Property. (Dkt. # 5 at 20–25.) "Equity is the value of property in excess of all encumbrances against it."

6

In re McManus, 30 F.3d 1491 (5th Cir. 1994) (citing Matter of Sutton, 904 F.2d 327, 329 (5th Cir. 1990)). "In considering the evaluation of property by bankruptcy courts . . . , valuation is determined [on a] case-by-case [basis], taking into account the nature of the debtor's business, market conditions, the debtor's prospects for rehabilitation, and the type of collateral." Matter of Sutton, 904 F.2d at 330. Appellant challenges both the factual premises and legal conclusions of the Bankruptcy Court.

First, Appellant argues that the Bankruptcy Court only considered Appellee's appraiser's testimony and appraisal and improperly ignored its own appraiser's testimony and appraisal. (Dkt. # 5 at 20–21.) Appellee's appraiser Chris Cauthen valued the Property at $53 million, utilizing the sales comparison approach and the income approach. (Id.) In contrast, Appellant's appraiser Paul Hornsby valued the Property at $204.7 million, utilizing the cost approach and sales comparison approach. (Id. at 21.) On review of the record, this does not constitute clear error. Judge Davis did not consider Hornsby's valuation to be credible, which was within his discretion as the fact finder to disregard evidence he did not consider credible.

Second, Appellant argues that the Bankruptcy Court ignored other pertinent evidence in the record, including the Travis County Appraisal District valuing the Property at $80 million for tax purposes, the $80 million purchase price

of the property in 2018 while it was known that 3M was vacating the building, the testimony from Hornsby that the Austin office market has been growing at rates between six and nine percent per year, and the value added by the improvements[1] Appellant made to the Property. (Dkt. # 5 at 21.) However, Judge Davis did not find the market increases to justify the value of the Property increasing by two and half times what it was worth two years prior. (Id. at 304.) Judge Davis further did not consider the market value of the improvements to be as high as Appellant provided or that it should be considered in the valuation of the Property, but even if he had, Judge Davis's finding that there was no equity would stand even if he did consider the alleged value of the improvements. (Id. at 306–07.) Neither of these findings of fact were in error.

      Appellant further argues that Cauthen's appraisal is discredited by Robert Perelman's testimony, which provided that the Original Lender reported the

---

[1] Cauthen testified that the only potential improvements he was aware of was painting the building's exterior, and that painting can be considered maintenance as well. (Id. at 100.) He further concluded that painting is a minimal improvement, not substantial. (Id.)

However, Nate Paul described the painting of the exterior of the buildings on the Property to have added $1.5 million in value. (Id. at 160–61.) He also states that they made changes to the landscaping, updated signs, and made improvement around doors. (Id. at 165.) Even taking the improvements described by Paul and his estimation of their market value, which he did not find appropriate from a valuation perspective, the Judge said he would still have found that Appellant did not have equity in the Property. (Id. at 307.)

8

loan on the Property to be well-secured by the equity in the Property and that the Original Lender had not taken an impairment on the loan. (Id.) However, Judge Davis did not find this testimony to address the value in a meaningful way and found this information to not be useful without the appraiser from 2018 being in court. (Id. at 306.) This was also not clear error.

Third, Appellant challenges the Bankruptcy Court not considering the value added by the on-site power plant. (Id. at 22.) Hornsby testified that the power plant provided $25 million in value to the Property because it could supply all the Property's electrical needs. (Id.) Appellant further argues that this evidence is bolstered by the fact that Appellee's appraiser Cauthen admitted the power plant could supply all the power to the Property.[2] (Id.) However, Cauthen's testimony provided that the value of the power plant was highly speculative and would depend entirely on the use and amount of power draw as to whether there would be savings for a non-research and development use such as what 3M operated. (Id. at 96.)

Appellant further argues that no credit was given to the uncontroverted evidence that cost savings could be attributed to the plant or that

---

[2] In a question on cross-examination, when asked whether the power plant could supply all the electrical needs for the property, Cauthen responded, "That's my understanding, yes." (Id. at 95.)

9

the electricity could be sold on the grid. (Id. at 22.) However, this is a mischaracterization of the evidence. Cauthen testified that the power plant has no discernible utility because it is not connected to Austin Energy, so the power plant is necessary for the Property to have power at all.[3] (Id. at 96, 108.) Judge Davis found that Cauthen's "decision to not put a value on the power plant was reasonable," and "doing so without knowing the actual tenant use would be speculative and indefensible." (Id. at 302.) Again, this finding of fact is not clear error.

    Fourth, Appellant argues that the Bankruptcy Court disregarded the value provided by the excess vacant land, which provides 21-million square feet of developable land. (Id. at 22.) Appellant argues that the Bankruptcy Court determined the excess land was worthless, which it argues would be unsupported by either appraiser's testimony. (Id. at 23.) However, Cauthen testified that development on the vacant land would be "extremely challenging for a number of reasons, and lists issues with zoning, environmental restrictions and sensibilities, limitations due to financial feasibility and demand, and negative effects on the pre-existing building on the Property's value. (Id. at 103.) Cauthen's estimate also

---

[3] Cauthen was told later by Appellant's counsel that the Property does have access to Austin Energy and pays a bill every month, and that the sole utility of the power plant is not to just power the building. (Id. at 118.)

10

valued the land at $9 per square foot, which was included in his appraisal—the value of which was adopted by Judge Davis.

Cauthen ultimately concluded that it is "not feasible to develop on the land at this time." (Id.) Cauthen further explained that he valued the vacant land at $9 per square foot as opposed to Hornsby's $15.86 per square foot valuation because of accessibility, topographic, and zoning limitations that make the land "inferior in terms of pricing based on comparison, location, size, [and] utility" compared to sales of comparable land, which made it more reasonable to value the land at the lower end of the potential range. (Id. at 105.) Judge Davis credited Cauthen's valuation of the excess land as credible and persuasive. (Id. at 306.) Judge Davis's findings regarding the vacant land are also not clear error.

Fifth, Appellant argues that it was clear error to place no weight on Hornsby's valuation using the cost approach because the cost approach is "useful when valuing specialty properties that are not frequently sold." (Id.) Appellant asserts that the cost approach is an accepted method for appraising property, and that the Bankruptcy Court "must consider both appraisals 'to arrive at a realistic market value.'" (Id.) (citing In re Ainsworth, Case No. 17-20418, 2018 WL 5304719, at *4 (Bankr. S.D. Tex. Oct. 23, 2018)).

"The three traditional approaches to determining market value are the comparable sales method, the cost method, and the income method." Ainsworth,

11

2018 WL 5304719, at *8 (citing City of Harlingen v. Estate of Sharboneau, 48 S.W.3d 177, 183 (Tex. 2001)). "When comparable sales figures are lacking or the method is otherwise inadequate as a measure of fair market value, courts have accepted testimony based on the cost approach and the income approach." Estate of Sharboneau, 48 S.W.3d at 183. "The cost approach, which looks to the cost of replacing the condemned property, is best suited for valuing improved property that is unique in character and not frequently exchanged on the marketplace." Id. Further, the cost approach "tends to set the upper limit of true market value." Id.

Courts have found the cost approach unhelpful when "no one would think of reproducing the property," United States v. Toronto, Hamilton, & Buffalo Nav. Co., 338 U.S. 396, 403 (1949), and inappropriate when there is no showing "that substantial reproduction would be a reasonable business venture" United States v. Benning Hous. Corp., 276 F.2d 248, 250 (5th Cir. 1960). Moreover, "[a]n appraisal method is only valid if it produces an amount that a willing buyer would actually pay to a willing seller." Id. And courts conducting valuations in the Fifth Circuit have "broad leeway" in determining their approach and are "not tied to any particular methodology." Ainsworth, 2018 WL 5304719, at *8 (quoting In re Diamond Beach, 551 B.R. 590, 609 (S.D. Tex. 2016)).

While the Property is unique in character and not frequently exchanged on the marketplace, both appraisers agreed that the Property is best

12

suited for a multi-tenant use, which would require stripping the building of all but its shell, reconfiguring the building into spaces for more than one tenant, and adding parking at the very least. The fact that the Property has been on the market for two years with no activity shows that this type of building would not be a reasonable business venture such that someone might think of reproducing the building. Further, the comparative properties used by Cauthen in his comparable sales approach are accurate and credible comparisons for the Property. In contrast, Hornsby's methodology for the comparable sales approach was flawed because all but one of his comparative properties were not appropriate comparators due to large discrepancies in size, age, condition, and other characteristics. Based on the undisputed best use of the Property, potential buyers and tenants are not likely to base their decision to buy or lease the Property on what it would cost to reproduce a Property that is not fit for their buying or leasing purpose in its current state. Therefore, the cost approach does not have any bearing on what a willing buyer would pay a willing seller.

Thus, this is not the type of property where the cost approach is useful, and it was not legal error for Judge Davis to not rely on a valuation using the cost method and a flawed version of the comparable sales approach. Further, Judge Davis did consider both appraisals in arriving at the market value for the Property. It was not legal error for Judge Davis to disregard an appraisal that was

not credible, not based on reasonable costs, and that did not employ proper methodology.

Viewing all the evidence, this Court concludes that the valuation finding by the Bankruptcy Court is adequately supported by the evidence and is neither factually nor legally erroneous. And the Bankruptcy Court in this case justifiably exercised its discretion in choosing to rely on valuation methods other than the cost approach. Based on the Bankruptcy Court's valuation, Appellant did not have equity in the Property because the Property's value is $53 million, and the debt owed is over $64 million.

## II. Reasonable Prospect of Reorganization

Once the Appellee–Lender successfully bore the burden of proof to show that the Debtor had no equity in the Property, the Debtor bears the burden of demonstrating that the Property was necessary to an effective reorganization for which there was a reasonable likelihood of success within a reasonable time. The Appellant–Debtor, however, argues that the Bankruptcy Court clearly erred in finding that it did not have a reasonable prospect of reorganization because it held Appellant to a higher standard than was required and there was no testimony or evidence on the record to dispute their evidence that they did have a reasonable prospect of reorganization. (Dkt. # 5 at 27.)

"Courts have consistently construed § 362(d)(2)(B) to require a showing by the debtor that there is a reasonable possibility of a successful reorganization within a reasonable time." In re Timbers of Inwood Forest Assocs., Ltd., 808 F.2d 363, 370 (5th Cir. 1987) (footnotes omitted), aff'd sub nom. United Sav. Ass'n of Texas v. Timbers of Inwood Forest Assocs., Ltd., 484 U.S. 365 (1988). "The mere indispensability of the property to the debtor's survival and the debtor's hopes of reorganization are insufficient to justify continuation of the stay when reorganization is not reasonably possible." Id. at 370–71. "To prevail against the secured creditor who has moved to lift the stay under § 362(d)(2), the debtor must do more than evince high hopes; he must be able to show a reasonable prospect for a successful reorganization within a reasonable time." Id. at 371.

"The plan for reorganization need not be a guaranteed success, but should have reasonable assurances of commercial viability." In re Omni Lion's Run, L.P., 578 B.R. 394, 400 (Bankr. W.D. Tex. 2017) (citing In re Geijsel, 480 B.R. 238, 256 (Bankr. N.D. Tex. 2012)). The Bankruptcy Court should consider "standard feasibility factors in its determination of a prospect for reorganization, including but not limited to the earning power of the properties, economic conditions, business prospects, a debtor's management ability, and the probability of continued management." Id. (citing Geijsel, 480 B.R. at 257.)

15

Debtor, as a single-asset debtor with the single asset being the Property at issue in this case, did not show that it had a reasonable prospect of reorganization. Judge Davis in his oral ruling explained that between the time the Debtor acquired the Property in 2018—with knowledge that the loan would mature the following year and the only tenant would vacate the Property in that year—and 2020, there was "no evidence of an actual source of alternate financing or of an actual replacement tenant or tenants." (Dkt. # 5 at 307.) The Judge acknowledged that while the Debtor had done some work to the Property, it was undisputed that in order for the Property to be suitable for its best use, it needed additional parking, upgraded windows, additional windows, HVAC, electrical work, data cabling, and plumbing work. (Id.) The Judge further found that there was no evidence to suggest that the Debtor had sufficient funds or the sources of funds it would need to make these necessary improvements even if it discounted lease rates to tenants, which would be the sole source of funds for the extensive improvements. (Id.)

The Bankruptcy Judge also found that it was unclear how the Debtor would be able to fund ongoing operation expenses or pay for improvements—even if the Debtor was able to acquire tenants in the near future. (Id. at 308.) Acknowledging the applicable legal standard, the Judge found that no discernible path to success had been shown by the Debtor. (Id.) There were concerns with having an under-secured lender, being in a state of bankruptcy, and dealing with

16

leasing out a massive office space during times when COVID-19 remains an ongoing barrier to businesses fully returning to office work. (Id.) The Bankruptcy Judge did not determine that the Debtor's evidence of having conversations with a prospective tenant overcame these hurdles to show a reasonable prospect of reorganization. (Id.)

Having found that there was no reasonable prospect of reorganization via a tenant or buyer, the Judge considered the option of refinancing, which he found failed for the same reasons that he found Debtor did not have equity in the Property. (Id.) Lacking tenants, the necessary attributes to attract tenants, and the funds to make necessary improvements to attract tenants, Judge Davis found there was no reasonable prospect of income to the Property or ability to service the existing debt. (Id.) Therefore, the Bankruptcy Judge found—without error—that the Debtor had no reasonable prospect of reorganization, which means his granting of the Motion for Relief from Stay was not clear error or an abuse of discretion.

## CONCLUSION

For the reasons set forth, the Court **AFFIRMS** the Order Granting Lender's Amended Motion for Relief from Stay filed in Bankruptcy Court on November 24, 2020. (Dkt. # 1.)

**IT IS SO ORDERED.**

**DATED:** Austin, Texas, February 14, 2022.

_____
David Alan Ezra
Senior United States District Judge